**EL DIA, INC., et al., Plaintiffs,**

v.

**Governor Pedro ROSSELLO,
et al., Defendants.**

**No. CIV. A. 97–2841 (JAF).**

United States District Court,
D. Puerto Rico.

Nov. 24, 1998.

Arturo Trias, Trias, Acevedo & Otero, San Juan, PR, Bruce W. Sanford, Mark A. Cymrot, Frederick W. Chockley, Robert D. Lystad, Bruce D. Brown, Baker and Hostetler LLP, Washington, DC, for El Dia, Inc., Puerto Rican Cement Company, Inc., Desarrollos Multiples Insulares, Inc., plaintiffs.

John M. Garcia–Nokonechna, Garcia & Fernandez Law Offices, Hato Rey, PR, James F. Hibey, Lisa K. Hsiao, Verner, Liipert, Bernhard, McPherson and Hand, Chartered, Washington, DC, Elfrick Mendez–Morales, Department of Justice of PR, Federal Litigation Division, San Juan, PR, William Sherman, Washington, DC, Joseph D. Steinfield, Hill & Barlow, Boston, MA, for Pedro Rossello, defendant.

Steven C. Lausell–Stewart, Jimenez, Graffam & Lausell, San Juan, PR, Alberto Rodriguez–Ramos, Martinez, Odell & Calabria, Hato Rey, PR, Elfrick Mendez–Morales, Department of Justice of PR, Federal Litigation Division, San Juan, PR, Adam J. Hodkin, Roma W. Theus II, Brian K. Hole, Holland and Knight LLP, Fort Lauderdale, FL, for Norma Burgos, defendant.

Andres Guillemard–Noble, Nachman, Guillemard & Rebollo, Santurce, PR, Elfrick Mendez–Morales, Department of Justice of PR, Federal Litigation Division, San Juan, PR, David H. Marion, Jeremy D. Mishkin, Montgomery, McCracker, Philadelphia, PA, for Angel Morey, defendant.

Frank Gotay–Barquet, Feldstein, Gelpi, Hernandez & Gotay, Old San Juan, PR, William L. Patton, Boston, MA, Thomas B. Smith, Douglas Hallward–Deiemeier, Ropes & Gray, Washington, DC, for Pedro Rosario–Urdaz, defendant.

David C. Indiano–Vicic, Indiano, Williams & Weinstein–Bacal, Hato Rey, PR, Elfrick

Mendez–Morales, Department of Justice of PR, Federal Litigation Division, San Juan, PR, for Jose A. Alicea–Rivera, defendant.

Luis Berrios–Amadeo, Cancio, Nadal, Rivera & Diaz, San Juan, PR, Elfrick Mendez–Morales, Department of Justice of PR, Federal Litigation Division, San Juan, PR, Sheldon H. Nahmod, Chicago, IL, for Maria Gordillo, Jose Caballero, Jose Rios–Davila, defendants.

## OPINION AND ORDER

FUSTE, District Judge.

Plaintiffs, El Día, Inc. ("El Día"), publisher of one of Puerto Rico's principal newspapers, *El Nuevo Día;* the Puerto Rican Cement Company, Inc. ("P.R. Cement"); and Desarrollos Múltiples Insulares, Inc., P.R. Cement's wholly-owned subsidiary, bring this action alleging that Puerto Rico Governor Pedro Rosselló and his administration violated their constitutional right to freedom of speech pursuant to the First, Fifth, and Fourteenth Amendments, U.S. Const. amend. I, V, and XIV, and Section 1 of the Civil Rights Act of 1871, 17 Stat. 13, as amended, 42 U.S.C. § 1983.

Plaintiffs allege that Defendants have violated their First–Amendment rights in retaliation for critical news coverage in *El Nuevo Día* by withdrawing advertising contracts in *El Nuevo Día;* revoking governmental approval for a P.R. Cement project in Vega Alta; revoking the permit for a P.R. Cement Project in Guánica; threatening to fine P.R. Cement over $2,000,000 for improper labeling of its cement bags; and numerous other incidents in which Defendants retaliated against Plaintiffs' business interests, in order to punish the owners of *El Nuevo Día* for critical press coverage of the Rosselló administration.

Previously, this court addressed numerous dispositive motions by Defendants. Some of the claims contained in the original complaint were dismissed and others survived. The bar to relief on the basis of qualified immunity was not available on the First–Amendment claims because Plaintiffs had evoked clearly-established First–Amendment rights. *See El Dia v. Rossello,* 20 F.Supp.2d 296, No. 97–2841, 1998 WL 564616 (D.P.R. Aug.28, 1998).

Defendants have now moved for a judgment on the pleadings pursuant to Fed. R.Civ.P. 12(c) alleging that (1) Counts II and III fail to allege federal constitutional right violations which are essential elements of 42 U.S.C. § 1983 claims;[1] and (2) the equitable relief Plaintiffs demand is improper under the federal abstention doctrine of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and the well-settled rule that land use matters are of peculiarly local concern and not properly litigated before federal courts.

Plaintiffs responded with a motion for leave of court to file an amended complaint pursuant to Fed.R.Civ.P. 15(a) and 15(c) and requested that the court reconsider certain aspects of our Immunity Order of August 28, 1998. In the alternative, Plaintiffs ask us to find: (1) El Día's right to recover for injuries suffered directly to its substantial investment in P.R. Cement; (2) P.R. Cement's right to sue, on the basis of its own constitutionally-protected, free-speech activity, for retaliation by the Rosselló administration; and (3) P.R. Cement's derivative right to litigate El Día's First–Amendment claim, in order to pursue damages and injunctive relief for harms P.R. Cement itself sustained as a result of El Día's speech.

Defendants subsequently filed a motion opposing Plaintiffs' amendment of the complaint. Defendants allege that (1) Plaintiffs' motion to amend is untimely; (2) Counts II through V of Plaintiffs' amended complaint fail to state claims that would survive a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6); and (3) Counts II and III of Plain-

---

**1.** Count II of Plaintiffs' original complaint alleged that P.R. Cement had a direct cause of action to recover for the injuries that it suffered as part of Defendants' retaliation against El Día's protected speech. Count III of Plaintiffs' original complaint alleged that P.R. Cement's procedural and substantive due process rights had been invaded. Count III of the original complaint has been amended to drop the procedural due process claim and has been renumbered as Count IV of the amended complaint.

tiffs' amended complaint fall squarely within the *Younger* doctrine of federal abstention.

## I.

### Plaintiffs' Motion to Amend Their Complaint

■ The Federal Rules of Civil Procedure liberally allow Plaintiffs to amend their pleadings at the discretion of the court. Fed. R.Civ.P. 15(a) ("leave shall be freely given when justice so requires"). The Supreme Court has emphasized that leave ordinarily should be granted "in the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Such amended pleadings relate back to the date of the filing of the original pleading, when the claim asserted "arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading." Fed.R.Civ.P. 15(c).

We find no bad faith or dilatory actions on the part of Plaintiffs. Leave to amend should neither expand the scope of discovery nor cause a disruption in the discovery or trial schedule. The amended complaint is premised upon the same nucleus of operative facts as the original complaint and, therefore, Defendants will not be subject to any unfair surprise, undue delay or prejudice.

We remain unpersuaded by Defendants' allegations of unseemly delay. Defendants rely upon the First Circuit's holding in *Quaker State Oil Refining Corp. v. Garrity Oil Co., Inc.,* 884 F.2d 1510 (1st Cir.1989) (denied Defendant's motion to amend complaint to serve fifth counterclaim). However, the facts in this case are significantly different. In *Quaker State,* the defendant waited nearly two years before moving to add the fifth counterclaim, a time period the First Circuit found to be "extreme". *Id.* at 1517. Here, Plaintiffs have acted within the span of one year, a time period that could hardly be characterized as "extreme" or unduly burdensome. Plaintiffs' motion to amend follows as a result of an August 28, 1998 order addressing certain dispositive motions. This has been a highly-active law suit. During the time span of one year, there have been copious motions filed with this court on the part of both Plaintiffs and Defendants and no party can be accused of lack of diligence in framing the issues in their pleadings. Plaintiffs can hardly be charged with sitting on their rights. While parties are charged with due diligence in moving to amend the pleadings, *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), we find no deviation from this standard on the part of Plaintiffs. Accordingly, we grant Plaintiffs leave to file their amended complaint in accordance with Fed.R.Civ.P. 15(a). This amended complaint will relate back to the date of filing of the original complaint, December 9, 1997, because the claim arises out of the "conduct, transaction or occurrence" in the original pleading pursuant to Fed. R.Civ.P. 15(c).

## II.

### Plaintiffs' Amended Complaint

Plaintiffs' amended complaint arises from allegedly improper and illegal actions of Governor Rosselló and his administration directed towards the Defendants due to critical press coverage of the Rosselló administration in *El Nuevo Día.* Plaintiffs allege violations of the First, Fifth and Fourteenth Amendments to the United States Constitution, U.S. Const. amend. I, V and XVI, and Section 1 of the Civil Rights Act of 1871, 17 Stat. 13, as amended, 42 U.S.C. § 1983. The first of the five counts alleges that Defendants Rosselló, Chief-of-Staff Angel Morey, and Press Secretary Pedro Rosario–Urdaz violated El Día's First–Amendment rights by withdrawing and denying government patronage in the form of advertising in *El Nuevo Día* on the basis of El Día's free-speech activity. Count II alleges that Defendants Rosselló, Morey, Rosario–Urdaz, Secretary of State Norma Burgos, Secretary of Consumer Affairs José Alicea–Rivera, and María Gordillo and José Caballero, members of the Puerto Rico Planning Board, illegally retaliated against P.R. Cement by issuing a cease and

desist order, denying a permit, and threatening large fines in retaliation for constitutionally-protected activity by El Día. Count III charges that Defendants' aforementioned actions were done in retaliation for constitutionally-protected speech and petition activities undertaken by P.R. Cement. In Count IV, P.R. Cement raises El Día's free-speech rights under the doctrine of derivative liability for harms Defendants inflicted upon P.R. Cement in retaliation for speech activities of El Día. Finally, Count V charges that Defendants violated P.R. Cement's substantive due-process rights.[2]

## A. *Brief Factual Background*

*El Nuevo Día*, a widely-read daily newspaper in Puerto Rico, published investigative reports throughout the early months of 1997 alleging patterns of fraud and waste in the Rosselló Administration. On April 13, 1997, *El Nuevo Día* published an article examining the first hundred days of Governor Rosselló's second term, asserting that the Governor had failed in key respects. The following day, Plaintiffs allege, eighteen government agencies began to cancel advertising contracts on orders from Defendant Rosselló and others in the upper echelons of his administration. Defendants allegedly withdrew the Commonwealth's extensive, lucrative, and recently-confirmed contracts with *El Nueva Día* in retaliation for the critical articles published in *El Nuevo Día*. Furthermore, Plaintiffs allege that Defendants Rosario–Urdaz and Morey pressured the newspaper to change its tone as the Rosselló administration shifted Commonwealth advertising to the much less-widely distributed competition. The Administration publicly claimed its shift was made on a cost-benefit basis. Plaintiffs assert that because *El Nuevo Día*'s cost of advertising per reader is lower than that of the competition, the shift of $500,000 per month of advertising could not have been cost effective. The shift in the Administration's policy caused a reduction of *El Nuevo Día*'s market share for state and municipal advertising from 50% to 15%, with municipal-

ities as the only remaining governmental advertisers.

The Ferré family completely owns El Día, which owns *El Nuevo Día*, and 25% of P.R. Cement. El Día owns 7% of P.R. Cement. Plaintiffs allege that (1) the Rosselló Administration engaged in a campaign to persecute P.R. Cement in retaliation for *El Nuevo Día*'s critical coverage; (2) the administration, subsequent to their cancellation of the advertising contracts, revoked governmental approval for a P.R. Cement project in Vega Alta without providing P.R. Cement with an opportunity to respond to the charges; (3) another governmental agency revoked a permit for a P.R. Cement project in Guánica; (4) Defendants, acting through the Department of Consumer Affairs ("DACO"), threatened to fine P.R. Cement over $2,000,000 for its improper labeling of its cement bags; and (5) Defendants launched a campaign against several of its business interests to punish *El Nuevo Día*'s owners for the paper's critical press, including revocation without the opportunity to be heard of a non-conforming use permit in Guánica; arbitrary governmental decisions favoring P.R. Cement's competitor, Mateco, Inc.; and an investigation by the Office of Monopolistic Affairs of the Puerto Rico Department of Justice.

## III.

### *Defendants' Motion for Judgment on the Pleadings*

Defendants have moved for a judgment on the pleadings on the original complaint, pursuant to Fed.R.Civ.P. 12(c). A motion for a judgment on the pleadings is ordinarily the final challenge to the pleadings which allows a party to attack the substantive sufficiency of the allegations. Such motions cannot be made until the pleadings are closed. However, the procedural posture of this case is somewhat different than that envisaged in the usual course of a lawsuit. We have allowed Plaintiffs to amend their complaint after Defendants submitted a motion for

---

**2.** Plaintiffs have abandoned their procedural due process claim. Additionally, we note that Plaintiffs have not included Puerto Rico Planning Board member José Ríos–Dávila as a party nor

asserted any claims against him. Therefore, we are assuming that Plaintiffs have voluntarily decided not to pursue any claims against him and he is dismissed from this lawsuit.

judgment on the pleadings. In the interests of efficiency and fairness to all parties, we, therefore, will analyze Counts II through V of Plaintiffs' amended complaint to determine whether Defendants are entitled to a judgment on the pleadings.[3]

### A. Standard for Motion for Judgment on the Pleadings

By filing a motion under Fed.R.Civ.P. 12(c), defendants assert that they are entitled to a favorable disposition of their case as a matter of law. 5 Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1368 (1969). Because the motion allows the court to summarily dismiss the claim on its merits, the court is required to view the facts presented in the pleadings in the light most favorable to the nonmoving party, the plaintiff. *Id.* Thus, for the purposes of consideration of this motion, the court will assume all the facts contained in plaintiffs' complaint to be true and regard all contravening assertions in defendants' motion to be false. *Id.; Beal v. Missouri Pac. R.R. Corp.,* 312 U.S. 45, 61 S.Ct. 418, 85 L.Ed. 577 (1941).[4]

### 1. Count II: El Día's Substantial Investment in P.R. Cement

■ As amended, Count II alleges that Defendants have taken deliberate steps to retaliate against El Día by illegally targeting P.R. Cement.[5] Plaintiffs maintain that Defendants intended to injure their investment by instituting harassing and retaliatory actions against P.R. Cement because of *El Nuevo Día*'s critical press coverage of the Rosselló administration. Therefore, Plaintiffs maintain that El Día's substantial investment in P.R. Cement entitles it to recover for injuries resulting from Defendants' First-Amendment violation.

■ The determinative issue in Count II as to whether Defendants are entitled to a judgment on the pleadings is whether Plaintiffs have standing to maintain such an action. Standing is the jurisdictional prerequisite that determines whether the party before the court is the proper party to bring the matter to the court for adjudication. *ASARCO, Inc. v. Kadish,* 490 U.S. 605, 612, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989) (citing *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). Standing raises the question of the relationship between the litigant and the subject matter of the litigation. The Supreme Court has elucidated three prudential requirements for standing: (1) plaintiff has suffered or will imminently suffer an injury; (2) that injury is traceable to defendant's conduct; and (3) a favorable federal court decision can redress the injury.[6] *Northeastern Florida Chapter of Associated Gen. Contractors of America v. Jacksonville,* 508 U.S. 656, 113 S.Ct. 2297, 2302, 124 L.Ed.2d 586 (1993); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (holding that "constitutional minimum of standing requires: (1) injury in fact; (2) causation; and (3) redressability").

It is apparent that Plaintiffs' pleadings satisfy both the second and third prongs of the standing inquiry. The injury complained of is directly traceable to actions by the Defendants, such as denying of land-use per-

---

3. We decline to analyze Count I, as it remains unchanged from the previous complaint and Defendants did not challenge it in their Rule 12(c) motion. We also note that in our previous opinion, we restricted our analysis to questions of immunity and deferred inquiry into Plaintiffs' substantive bases for dismissal. Now, however, is the appropriate time to explore these substantive bases as Defendants have raised these issues in their motion.

4. The preliminary step in any section 1983 claim is to identify the precise contours of the underlying claims. *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Thus, we look to the basis of each allegation claimed in our analysis on the present motion.

5. The Ferré family allegedly owns 25% of the stock of P.R. Cement. In combination with El Día's 7% stock interest, the Ferré family controls 32% of P.R. Cement's stock. Depending on the corporate structure of P.R. Cement, this may constitute a controlling interest. Since the Ferré share is at least a strong partial holding of the corporation's stock, we do not need to confirm Plaintiffs' claim regarding whether the family's share is controlling.

6. The constitutional requirement for standing, that the matter is a "case or controversy" under Article III of the Constitution, is not disputed in this case.

mits and instigating investigations, and a favorable decision by this court will redress these injuries. Therefore, our inquiry necessarily turns to the first prong, whether Plaintiffs have or will suffer a direct harm.

In making this determination, we begin by examining the analogous cases of shareholder standing and the showing necessary to constitute irreparable harm for an injunction. We look to these parallel cases to glean the general principles guiding federal courts confronted with federal-standing issues. While shareholders generally do not have standing to bring suits on behalf of corporations, if the shareholder has a direct, personal interest in the law suit, the bar to standing is lowered and the plaintiff may bring the suit. Rotunda and Novak, *Treatise on Constitutional Law*, 2d ed., § 2.13, 228–29 (1992); *see discussion in, Shell Petroleum, N.V. v. Graves*, 709 F.2d 593, 595 (9th Cir.1983). Additionally, courts have found that a substantial investment in a corporation is sufficient to show the requisite irreparable harm for an injunction. *Yamaha Corp. of America v. Ryan*, No. 89–5574, 1989 WL 167604 *3 (C.D.Cal. Nov.6, 1989) (holding that injury to the substantial investment Yamaha had made in MUSICSOFT constituted irreparable injury for injunctive purposes); *Loral Corp. v. B.F. Goodrich Co.*, No. C–3–86–216, 1989 WL 206377 *49 (S.D.Ohio June 8, 1989) (finding that substantial investments BFG made in carbon brake field established actual prejudice and injury); *see also Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) (holding that loss of customer goodwill and competitive injury can constitute irreparable injury because damages flowing from such losses are difficult to compute); *Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir.1991) (same); *Spiegel v. Houston*, 636 F.2d 997, 1001 (5th Cir.1981). Some courts have even concluded that irreparable harm can be inferred from a defendant's wrongful conduct. *Curtis 1000, Inc. v. Youngblade*, 878 F.Supp. 1224 (N.D.Iowa 1995) (citing *Overholt Crop Ins. Serv. Co. v.*

*Travis*, 941 F.2d 1361, 1371 (8th Cir.1991) (finding irreparable harm from "trial court's actual finding of a breach [of a restrictive covenant] by the defendant")).

Plaintiffs' allegation is that their investment in P.R. Cement is being unconstitutionally harmed in retaliation for critical press coverage in *El Nuevo Día*. Thus, like the case of an interested shareholder, Plaintiffs have asserted a direct and personal interest in this case. This alleged harm undoubtedly goes beyond a pure economic interest as the Ferré family owns *El Nuevo Día* and has, at a minimum, a strong partial holding of P.R. Cement's stock. Most significantly, the leadership of El Día and P.R. Cement are closely intertwined.[7] Given this state of affairs, it is abundantly clear that an attack on P.R. Cement would adversely affect El Día. It is no stretch of the imagination to see that one wishing to retaliate against El Día would target P.R. Cement, its sister company, and that such retaliation would directly affect El Día. That is the very allegation that Plaintiffs are making in this case. Thus, Plaintiffs' substantial investments and personal stake in P.R. Cement seem to justify a relaxation of the standing requirements.

Viewing the pleadings in the light most favorable to Plaintiffs, as we must, we find that Plaintiffs have stated a direct injury to their interest in P.R. Cement and, therefore, Defendants are not entitled to a favorable judgment as a matter or law. We, therefore, deny Defendants' motion for a judgment on the pleadings as to Count II of the amended complaint.

### 2. *Count III: P.R. Cement's Free-Speech and Petition Rights*

In Count III, Plaintiffs allege that Defendants have violated P.R. Cement's constitutional rights to free speech and petition. Specifically, Plaintiffs allege that P.R. Cement President Nazario's public criticism of government officials and accusations of their retaliation against both El Día and P.R. Ce-

---

7. Mr. Antonio Luis Ferré is President and Publisher of *El Nuevo Día* and Chairman of P.R. Cement's Board of Directors. Mr. Antonio Luis Ferré Rangel is a Director and Executive Vice President of P.R. Cement and a Director of El Día, Inc. Mr. Luis Alberto Ferré Rangel is a Co-Editor of *El Nuevo Día* and a Director of P.R. Cement, and Mr. Miguel Nazario is President and Chief Executive Officer of P.R. Cement and a Director of El Día, Inc.

ment are protected speech and that P.R. Cement's filing of lawsuits and complaining to regulators concerning the alleged harassment against it, including the DACO proceeding and manipulation of land-use permits, constitute constitutionally-protected petitioning activity.

At the outset, we note that Plaintiffs' amended complaint differs significantly from the original complaint by alleging that actions which P.R. Cement itself took instigated Defendants' retaliation. This stands in marked contrast to the allegations of the original complaint which attributed Defendants' retaliation to P.R. Cement's relationship with El Día. Defendants' motion addresses only Plaintiffs' original complaint and challenges it for failing to allege any constitutionally-protected activity by P.R. Cement. As Plaintiffs have amended their complaint to include activities attributable to P.R. Cement, Defendants' arguments are irrelevant. Nonetheless, we find it incumbent upon us to analyze Plaintiffs' cause of action to see whether Defendants are entitled to a judgment on the pleadings as a matter of law.

Count III of Plaintiffs' amended complaint meets the requirements for standing. There is (1) an injury to P.R. Cement, the denial of permits and instigation of an investigation which was (2) caused by the Defendants and is (3) redressable by this court via an injunction. Thus, P.R. Cement has standing to bring this action. Additionally, Plaintiffs have stated a cause of action, that Defendants' retaliatory actions against P.R. Cement violate P.R. Cement's First–Amendment rights to speech and petition.

█ However, there is a timing problem. The DACO investigation was reinitiated on April 24, 1997 and the first acts of protected free speech alleged by P.R. Cement began on April 25, 1997. *See Docket Document No. 232.* Thus, it is impossible for the reinstatement of the DACO investigation to be retaliation for protected speech activity of P.R. Cement as there was no speech prior to the reinstatement of the investigation. However, DACO Secretary Alicea's October 15, 1997 order declaring his intent to fine PRCC over $2,000,000, the Administracíon de Reglamentos y Permisos' ("ARPE") revocation of

P.R. Cement's land permits in Guánica, and the Office of Monopolistic Affairs investigation of the cement industry in Puerto Rico are all events that occurred after P.R. Cement engaged in protected-speech activity. Therefore, we grant Defendants' motion for judgment on the pleadings as to the DACO investigation segment of Count III, and we deny their motion as to DACO Secretary Alicea's October 15, 1997 order, ARPE's revocation of the Guánica permit, and the Office of Monopolistic Affairs investigation segments of Count III.

### 3. *Count IV: P.R. Cement's Third Party Standing Claim*

█ In Count IV, Plaintiffs assert a claim of derivative liability to obtain relief for harm inflicted upon P.R. Cement as a result of constitutionally-protected speech activity by El Día. In other words, P.R. Cement is making a third-party claim for violation of El Día's rights. In their original complaint, Plaintiffs pled this claim as a violation of P.R. Cement's First–Amendment rights and we determined that P.R. Cement's relationship with El Día was not a constitutionally-protected associational right. *See Docket Document No. 146,* 20 F.Supp.2d 296 (D.P.R. 1998). However, due to the fact that Plaintiffs have amended their complaint, we must now examine the new claim in light of Defendants' motion for a judgment on the pleadings.

█ Analysis of Count IV of Plaintiffs' amended complaint necessitates that we examine the doctrine of third-party standing. One of the prudential limits on standing is that plaintiffs must assert their own legal rights and interests. *Hodel v. Irving,* 481 U.S. 704, 711, 107 S.Ct. 2076, 95 L.Ed.2d 668 (1987); *Casanas v. De Leon,* 633 F.Supp. 22, 23–24 (D.P.R.1986) (finding that section 1983 claims cannot be predicated on a violation of another person's constitutionally-protected rights). While standing rules are generally strictly enforced, the Supreme Court has lowered such requirements to allow third-party standing in certain cases in order to protect civil rights. In *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), the Court articulated a bipartite test

for third-party standing: The court examines the relationship between plaintiff and the person whose right he seeks to assert and determines if (1) the enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue; and (2) if the litigant is as effective a proponent of the right as the third party. *Id.* In such cases, the court weighs the importance of the relationship between the litigant and the third party, the ability of the third party to vindicate his own rights, and the risk that the rights of the third party will be diluted if standing is not allowed. Rotunda & Nowak, *Treatise on Constitutional Law,* 2d ed., § 2.13, 220 (1992); *see also Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); Note, *Standing to Assert Constitutional Jus Tertii,* 88 Harv.L.Rev. 423, 441 (1972).

■ In the First–Amendment arena, the Court has relaxed third-party standing rules when the effect of a challenged law or regulation may chill protected speech. *Secretary of Maryland v. Joseph H. Munson Co., Inc.,* 467 U.S. 947, 956, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984) (stating "[l]itigants ... are permitted to challenge a statute not because their own rights of free expression are violated but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression") (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)); *Virginia v. American Booksellers Ass'n, Inc.,* 484 U.S. 383, 392–93, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988). Concern that laws will stifle speech protected by the First Amendment justifies lowering the jurisdictional standing requirements. *Eisenstadt v. Baird,* 405 U.S. 438, 445 n. 5, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (noting that the Court has eased strict construction of traditional standing rules in First Amendment cases "without regard to the relationship between the litigant and those whose rights he seeks to assert precisely because application of those rules would have an intolerable, inhibitory effect of freedom of speech"); *Shimer v. Washington,* 100 F.3d 506 (7th Cir.1996). This doctrine has been expanded beyond conventional cases of statutory overbreadth. *Amato v. Wilentz,* 952 F.2d 742, 750 (3rd Cir.1991).[8]

A trilogy of recent New York federal district court cases involving challenges based upon a third party's speech shed some light on this emerging area of law. We examine each in turn.

### a. *Romano v. Harrington*

In *Romano v. Harrington,* 664 F.Supp. 675 (E.D.N.Y.1987), a high-school faculty advisor was fired as a result of his role in the publication of a controversial article in the school newspaper. A student had written the article, opposing the designation of Martin Luther King, Jr. day as a federal holiday. Plaintiff did not endorse the views of the author of the article, although he had assisted in its editing to ensure compliance with the journalistic standards of the paper. Subsequent to publication of the article, plaintiff was dismissed from his position as faculty advisor to the newspaper.

Noting that the case added a new level of complexity to traditional standing requirements, the court nonetheless upheld the faculty advisor's standing to raise the students' First–Amendment rights. The court concluded that "the students' enjoyment of their First Amendment rights is inextricably bound up with plaintiff's role as faculty advisor to the school newspaper, and the relationship of a faculty advisor and the newspaper staff ... is ... sufficiently close to satisfy the *Singleton* test." 664 F.Supp. at 681.

**8.** Examples include: *Mackey v. Nationwide Ins. Cos.,* 724 F.2d 419 (4th Cir.1984) (holding that black insurance agent's loss of commissions was sufficient injury to challenge former employer's discriminatory practices of arbitrarily refusing to issue insurance policies in predominately-black neighborhoods); *Cutting v. Muzzey,* 724 F.2d 259, 260 (1st Cir.1984) (holding that vendor can assert violation of his own rights on basis of discrimination against customers); *Holland v. Illinois,* 493 U.S. 474, 475–76, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990) (holding that white criminal defendant had standing to raise Sixth–Amendment rights of potential veniremen by challenging racially discriminatory use of peremptory challenges to eliminate black persons from the trial jury).

### b. *Dangler v. Yorktown Central Schools*

Four years later, in *Dangler v. Yorktown Central Schools,* 771 F.Supp. 625 (S.D.N.Y. 1991), the Southern District found that a high-school student had standing to raise his father's free-speech rights. This case involved the student's allegation that the faculty council denied his admittance into the National Honor Society based on his father's protected free-speech activity. The father was a vocal critic of the school board and administration and had spoken out publicly concerning many aspects of the public education process, including the awarding of school-bus contracts.

Also applying the bipartite *Singleton* test, the court found that the student had standing to raise his father's rights. Under the first prong, the court noted that the logical extension of threatening parents who speak out on issues of public concern with retaliatory measures against their children is a chilling effect on protected speech and, as such, the child's rights were "inextricably bound" up with those of his parent. As to the second prong—whether the parent could, on his own, vindicate his own freedom of speech— the court found that in order to do so, the father would need to assert damages accruing to him as a result of his son's rejection from National Honor Society, something to which no monetary value can be attached. Given the facts, the court held that the child was the appropriate party to sue if the goal is eradication of the subtle retaliation alleged.

### c. *Kounitz v. Slaatten*

Two years later, in *Kounitz v. Slaatten,* 901 F.Supp. 650 (S.D.N.Y.1995), the court seemingly retrenched on the issue of third-party standing in First–Amendment cases. Plaintiffs, husband and wife, sued the wife's former employer under section 1983 for First–Amendment violations.[9] Plaintiff Lisa Kounitz worked in the County Attorney's Office, when she found out that she was pregnant. She was subsequently dismissed. Kounitz alleged that defendant terminated her from her position as an Assistant County Attorney based, in part, on protected-speech activities by herself and her husband. Kounitz' allegedly-protected speech was a comment by Lisa Kounitz that the firing of pregnant women "had consequences." 901 F.Supp. at 653. The husband's allegedly-protected speech consisted of a telephone call to the Director of Citizen Services complaining of his wife's supervisor's incompetence and mistreatment of staff.

The court refused to hear plaintiffs' free-speech claims because (1) the complaint failed to allege that Lisa Kounitz exercised her free-speech rights in an area of public concern; and (2) the husband failed to allege an injury in fact because of the absence of factual allegations of a concrete or imminent injury. In other words, the court denied third-party standing to the husband on the basis of no direct injury.

We find that P.R. Cement has standing to raise El Día's rights in the case at bar. We find the *Dangler* case particularly instructive to the facts here. In that case, a student was denied National Honor Society membership because of his father's public criticism of the school administration. Here, P.R. Cement has allegedly been retaliated against because El Día, a large shareholder, has publicly criticized the Rosselló administration. Both cases concern alleged retaliation against a third party based on a closely-related party's expression of free speech.

As in the *Dangler* case, we find the first prong of the *Singleton* analysis is satisfied. Threatening El Día's constitutional free-speech rights with retaliatory actions against P.R. Cement leads to a chilling effect on protected speech—censoring the expression of certain viewpoints. This is precisely the "intolerable, inhibitory effect" on freedom of speech that is repugnant to First–Amendment principles. Thus, we find that El Día's First–Amendment rights are "inextricably bound" up with those of P.R. Cement.

The second prong of our analysis asks whether El Día, on its own, could vindicate its own free-speech rights. Accepting Plaintiff's allegations as true, which we must, El Día, as owner of *El Nuevo Día* and as partial

---

**9.** The case also involved Title VII claims not germane to our First–Amendment discussion.

or controlling owner of P.R. Cement, suffered from the alleged retaliation against P.R. Cement that followed *El Nuevo Día*'s critical news coverage. While El Día may vindicate some of its own rights through Counts I and III of this lawsuit,[10] denial of third-party standing to P.R. Cement will leave wide open, with impunity, an avenue for retaliation against El Día. If the allegations are true and P.R. Cement is precluded from asserting its derivative liability claims, El Día is denied full protection of its constitutional rights. Not only is this significant for the overlapping owners and managers of El Día and P.R. Cement, but also for the other shareholders and managers of P.R. Cement who are allegedly the victims of the Rosselló administration's retaliation campaign. The shareholders and managers are innocent victims caught in a battle in which they have played no part. Given this situation, we find that P.R. Cement has satisfied the second prong of the *Singleton* test for derivative liability.

The purpose of the third-party-standing doctrine in First Amendment law is "not primarily for the benefit of the litigant but for the benefit of society—to prevent the [action] from chilling the First Amendment rights of other parties." *Munson*, 467 U.S. at 957, 104 S.Ct. 2839. We find that unlike the husband in *Kounitz*, P.R. Cement has alleged a direct injury and that a denial of derivative liability may impliedly sanction future constitutional violations. As characterized by Justice Cardozo, free speech is "[t]he matrix, the indispensable condition of nearly every other form of freedom," and denying third-party standing to P.R. Cement in this case endangers a host of other rights and parties. Therefore, we find that P.R. Cement has derivative standing to sue for damages suffered in retaliation for critical press coverage in *El Nuevo Día* in violation of El Día's free speech rights. We, therefore, find that Defendants are not entitled to judgment

on the pleadings and deny their motion as to Count IV.

#### 4. *Count V: P.R. Cement's Substantive Due Process Claim* [11]

Plaintiffs' final allegation, Count V, maintains that Defendants' deliberate intervention to suspend the Vega Alta project and arbitrary and capricious actions undertaken to instigate the DACO investigation represent abuses of official authority and violations of Plaintiffs' substantive due-process rights. In our earlier opinion, we granted Defendants qualified immunity as to Plaintiffs' due-process claim because: (1) the substantive due-process claim was unnecessary because where a First Amendment and a substantive due-process claim are both presented, the former trumps the latter; and (2) there is no "clearly established substantive due process right for a corporation to be free from retaliatory administrative decision making." [12] *Docket Document No. 146*, 20 F.Supp.2d 296, No. 97–2841, 1998 WL 564616 (D.P.R. Aug.28, 1998). However, as Plaintiffs correctly point out, this opinion did not address the merits of Plaintiffs' due process cause of action.

■ Defendants have now moved for a judgment on the pleadings as to Plaintiffs' due-process claim. Defendants maintain that Plaintiffs have failed to allege the absence of adequate procedural remedies or that any of the violations were of "truly horrendous" proportions necessary to allege a substantive due-process violation. Plaintiffs ask that we deny this motion and request reconsideration on the grant of qualified immunity in light of the Supreme Court's recent opinion in *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).

#### a. *Standard for Substantive Due-Process Claims*

■ Substantive due process forbids arbitrary governmental decisions "regardless

---

**10.** Count I alleges violation of El Día's First, Fifth, and Fourteenth Amendments and 42 U.S.C. § 1983 rights by Defendants Rosselló, Morey, and Rosario–Urdaz.

**11.** In their amended complaint, Plaintiffs have abandoned their procedural due-process claim.

**12.** While we also articulated a third reason, that a public official would not know of potential liability for a substantive due process violation, it is not relevant here as it deals solely with the question of qualified immunity.

of the fairness of the procedures used to implement them." *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) (quoting *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)). Substantive due process affords individuals protection against state actions which are "arbitrary and capricious," or those which, in context, appear "shocking or violative of universal standards of decency." *Amsden v. Moran,* 904 F.2d 748, 753–54, 757 (1st Cir.1990) (citations omitted). Only the most egregious governmental actions are "arbitrary" in the constitutional sense. *Collins v. Harker Heights,* 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992).

 Courts have sharply curtailed the applicability of substantive due process. Generally, substantive due process rights are disfavored, since "it is no simple matter to decide what abuses to regard as abuses of 'substantive' due process. Every litigant is likely to regard his own case as involving such an injustice." *Custodio,* 964 F.2d at 45. "[T]he predominant view among the federal courts has denied victims a federal remedy when a discretionary land use decision is tainted by substantive wrongs such as arbitrariness, improper motive, and personal or partisan bias." Stewart M. Wiener, *Substantive Due Process in the Twilight Zone: Protecting Property Interests from Arbitrary Land Use Decisions,* 69 Temple L.Rev. 1467, 1468 (1996). As the First Circuit stated in *PFZ Properties, Inc. v. Rodriguez,* 928 F.2d 28, 31–32 (1st Cir.1991):

> Rejections of development projects and refusals to issue building permits do not ordinarily implicate substantive due process. Even where state officials have allegedly violated state law or administrative procedures, such violations do not ordinarily rise to the level of a constitutional deprivation. The doctrine of substantive due process does not protect individuals from all [government] actions that infringe liberty or injure property in violation of some law. Rather, substantive due process prevents governmental power from being used for purposes of oppression, or abuse of government power that shocks the conscience, or action that is legally irrational

in that it is not sufficiently keyed to any legitimate state interests.

*Id.* (internal quotations and citations omitted). More recently, the First Circuit stated, "[w]e have consistently held that the due process clause may not ordinarily be used [in cases involving] the rights and wrongs of local planning disputes ... we have left the door slightly ajar for federal relief in truly horrendous situations." *Custodio,* 964 F.2d at 45. Such "truly horrendous" situations rarely arise. " 'It is not enough to show that a regulatory board "exceeded, abused or 'distorted' its legal authority.' Indeed, even bad-faith violations of state law do not necessarily implicate an unconstitutional deprivation of due process." " *Baker v. Coxe,* 940 F.Supp. 409, 415–16 (D.Mass.1996) (citing *Creative Environments, Inc. v. Estabrook,* 680 F.2d 822, 833 (1st Cir.1982) (holding that a local planning board's allegedly arbitrary misapplication of state law did not constitute a substantive due process violation)); *see also Chiplin Enterprises, Inc. v. Lebanon,* 712 F.2d 1524, 1528 (1st Cir.1983) (stating that a substantive due process claim premised on arbitrary, malicious and bad-faith official action was insufficient); *Amsden v. Moran,* 904 F.2d at 757–58 (1st Cir.1990) (discussing *Creative Environments* and *Chiplin* ).

#### b. *City of Sacramento v. Lewis*

In the *Lewis* plurality opinion, the Supreme Court examined substantive due process in the context of a high-speed police chase of a motorcyclist. The parents of the decedent, a passenger on the motorcycle, brought the action under 42 U.S.C. § 1983 alleging deprivation of the decedent's substantive due process right to life. The court found that plaintiffs' allegation that the officer had exhibited deliberate indifference with regard to the life of the passenger in undertaking the chase was not sufficient to state a substantive due-process claim.

Plaintiffs assert that we should follow the analysis set forth in *Lewis* and, in turn, reconsider our prior grant of qualified immunity. Without going into a lengthy examination of the Supreme Court's reasoning in *Lewis,* we reject both of Plaintiffs' contentions.

■ There is a long history of judicial restraint with regard to substantive due-process claims where another specific constitutional provision affords protection. *See, e.g., Albright v. Oliver,* 510. U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). Courts will not consider substantive due-process claims when there is an express textual source of protection in the Constitution. *Lewis,* —— U.S. at ——, 118 S.Ct. at 1715. The Court articulated this prudential rule of judicial restraint in *Graham v. Connor:*

> Where a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.

490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The Court reaffirmed this rule in *Lewis.* 118 S.Ct. at 1708. *See also Custodio,* 964 F.2d at 46–47 (stating that claim for denial of land use permit in retaliation for political expression best addressed under First Amendment, thus eliminating. the need for substantive due-process analysis).

Here, Plaintiffs' substantive due-process analysis is only appropriate if there is no other explicit textual provision conferring constitutional protection. That is not the case. Plaintiffs' Counts I through IV assert protection under the First, Fifth, and Fourteenth Amendments to the Constitution. In particular, Counts II, III, and IV of Plaintiffs' amended complaint concern violation of the First–Amendment rights of El Día and P.R. Cement as a result of the very· actions alleged under the due-process claim: denial of land-use permits and instigation of administrative investigations. As there is "an explicit textual source of constitutional protection," the First Amendment, to redress the harms alleged by Plaintiffs', we decline to

entertain Plaintiffs' substantive due-process claim.[13]

We grant Defendants' motion for judgment on the pleadings as to Count V of Plaintiffs' amended complaint, and deny Plaintiffs' request for reconsideration of Defendants' qualified immunity.

## IV.

### *Plaintiffs' Equitable Claims*

Defendants assert that Plaintiffs' equitable claims, an injunction reinstating P.R. Cement's right to proceed with the Vega Alta project and terminating the DACO investigation, are neither available nor proper. Specifically, Defendants allege that (1) federal equitable relief is improper in the Vega Alta project because it is a land use issue—a peculiarly local interest; and (2) federal court intervention in the DACO investigation is improper under the *Younger* doctrine.

### A. *The Vega Alta Project*

■ Defendants contend that federal court intervention into the denial of land permits at the Vega·Alta construction site is inappropriate because land-use matters are local concerns and not the province of the federal judiciary. To support their contention, Defendants cite one First Circuit case, *Nestor Colon Medina & Sucesores, Inc. v. Custodio,* 964 F.2d 32, 45 (1st Cir.1992) (stating "local and state agencies and courts are closer to the situation and better equipped [than federal courts] to provide relief" in land use cases).

■ It is undoubtedly true that state courts may be better equipped to decide purely land-use issues. *See San Remo Hotel v. San Francisco,* 145 F.3d 1095 (9th Cir. 1998) (holding *Pullman* abstention appropriate in constitutional challenge to city hotel ordinance); *Fralin & Waldron, Inc. v. Martinsville,* 493 F.2d 481 (4th Cir.1974) (holding

13. In so doing, we recognize that some courts have found substantive due-process violations in land-use cases. *Brady v. Colchester,* 863 F.2d 205 (2d cir.1988) (finding substantive due process could be violated if governmental actions were motivated by "impermissible political animus"); *Bello v. Walker,* 840 F.2d 1124 (3rd Cir.

1988) (finding substantive due process claim could be made if improper interference with building permit issuing process). However, given that Plaintiffs' claims are firmly grounded in First–Amendment jurisprudence, we are compelled to analyze them under that rubric.

*Thibodeaux* abstention appropriate in case involving construction of local land use ordinances). However, the simple involvement of a land-use issue does not relegate a case to state court. The Third Circuit, in *Heritage Farms, Inc. v. Solebury Township*, 671 F.2d 743 (3rd Cir.1982), examined a similar case involving the allegation of discrimination in the issuance of land permits and concluded:

> The policies embodied in the Municipalities Planning Code are not being attacked—it is rather the application of those policies by a single township that is at issue. In fact, if it is found that the defendants acted unlawfully, the state and local policies will be vindicated. Perhaps most importantly, this case is not simply a land use case. Rather the plaintiffs have alleged that members of the Board have used their governmental offices to further an illegal conspiracy to destroy plaintiffs' constitutional rights to conduct a legitimate business.

*Id.* at 748. The Third Circuit concluded that:

> It is incumbent upon district courts, faced with a claim arising out of land use questions, to examine the facts carefully to determine what the essence of the claim is. If it is an unlawful conspiracy like the one alleged here, the mere presence of land use issues should not trigger a mechanical decision to abstain.

*Id.* at 748. Ten years later, the Third Circuit reaffirmed its stance in *Gwynedd Properties, Inc. v. Lower Gwynedd Township*, 970 F.2d 1195 (3rd Cir.1992). *Gwynedd* involved a section 1983 action brought by a real-estate developer challenging the rejection of a land development plan. The court, analyzing the land-use issue under the important state interest prong of the *Younger* doctrine,[14] concluded that it was the malicious application of land-use ordinances, not the ordinances themselves, that was at issue and, therefore, federal court intervention was appropriate. *Id.* at 1202. In other words, challenges to policies or procedures themselves that are being adjudicated in a state forum ordinarily justify federal abstention, but illegal, malicious or vindictive administration of policies or procedures do not. A challenge to exploi-

tative processes or procedures is the precise domain in which federal courts should not stay their hands as a federal forum may be the only unbiased forum available to the plaintiff.

The situation before us is strikingly similar to that of both *Gwynedd* and *Heritage Farms*. The allegations center on illegal and discriminatory use of local land-use procedures, not the procedures in themselves. It is the application, not the process, that Plaintiffs challenge. Defendants cannot avoid federal court jurisdiction by mischaracterization of the claims at issue. Unconstitutional discrimination is not the exclusive province of state courts. The mere presence of a land-use issue does not require state court adjudication, particularly when the claim involves vindictive and malicious application of land-use procedures. Rather, such claims are exactly the place where federal court intervention is proper. Accordingly, we reject Defendants' contention that federal court jurisdiction is inappropriate.

## B. The DACO Investigation

 Defendants also allege that federal court intervention in the DACO investigation is improper under the *Younger* abstention doctrine.

### 1. Federal Abstention

 Federal courts have a constitutionally-imposed obligation to adjudicate cases and controversies properly before them. U.S. Const. art. III. The Supreme Court has confirmed that within constitutionally-permissible bounds, federal courts have no authority to abstain from exercising jurisdiction. *New Orleans Public Service, Inc. v. Council of New Orleans*, 491 U.S. 350, 357–60, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989). This obligation of adjudication is "virtually unflagging." *Id.* 109 S.Ct. at 2513 (quoting *Deakins v. Monaghan*, 484 U.S. 193, 203, 108 S.Ct. 523, 98 L.Ed.2d 529 (1988)). Nonetheless, the federal courts have created the doctrine of abstention. Under the abstention doctrine, federal courts decline to exercise

**14.** *See infra* IV(B)(2)(b).

jurisdiction in order for a state court or agency to adjudicate the issues.

■ Federal abstention is appropriate in certain delineated cases due to the discretion federal courts enjoy in fashioning certain types of relief. *Id.* However, abstention is "the exception, not the rule. 'The doctrine of abstention . . . is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it . . . .' " *Colorado River Water Conservation Dist. v. U.S.,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) (quoting *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959)). Accordingly, "[a]bstention rarely should be invoked." *Ankenbrandt v. Richards,* 504 U.S. 689, 705, 112 S.Ct. 2206, 119 L.Ed.2d 468 (1992).

### 2. *Younger v. Harris*

■ Under *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), federal courts are required to abstain from issuing federal court injunctions in situations where, absent bad faith, harassment, or a patently invalid state statute, there is a pending state criminal proceeding. *Id.* at 54, 91 S.Ct. 746. In other words, *Younger* abstention may apply even if a case involves a constitutional allegation and all jurisdictional and justiciability requirements are met. *Younger* abstention is based on the dual principles of equity and comity. The equitable basis dictates that federal courts should refrain from taking action when there is an adequate remedy at law and denial will not result in irreparable injury, while comity commands the proper respect for state courts, based on separation of powers principles. The *Younger* doctrine has been expanded to other closely circumscribed realms. *See Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) (nuisance); *Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977) (civil contempt); *Trainor v. Hernandez,* 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977) (attempt by state to recover fraudulently-obtained welfare benefits); *Moore v. Sims,* 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979) (attempt by state to obtain child custody); *Ohio Civil Rights Comm'n. v. Dayton Christian Schools, Inc.,* 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986) (state administrative proceedings involving important state interests); *Pennzoil Co. v. Texaco, Inc.,* 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987) (state civil proceedings between private parties).

■ Nevertheless, *Younger* abstention is only justified in "extraordinary circumstances." *Middlesex County Ethics Committee v. Garden State Bar Ass'n,* 457 U.S. 423, 431, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982); *Chaulk Servs. v. Massachusetts Comm'n Against Discrimination,* 70 F.3d 1361 (1st Cir.1995). Three criteria must be met for abstention under *Younger:* (1) there must be ongoing state proceedings that are judicial in nature; (2) the state proceedings must implicate important state interests; and (3) the state proceedings must afford an adequate opportunity to raise the federal claims. *Id.* at 432, 102 S.Ct. 2515. Even in cases where all three predicates for *Younger* abstention are found, federal courts should not abstain if the state proceedings are undertaken in bad faith or other extraordinary circumstances are involved or a patently unconstitutional statute is at issue. 401 U.S. at 54, 91 S.Ct. 746.

### a. *Ongoing State Proceedings*

■ There have been several state judicial proceedings relating to the DACO investigation. The real question is whether there are any pending state judicial proceedings such that the first prong of the *Younger* doctrine is satisfied. Federal courts look to the date plaintiff filed his original complaint to determine whether abstention is appropriate. *Bettencourt v. Bd. of Registration in Medicine of Massachusetts,* 904 F.2d 772, 777 (1st Cir.1990). The DACO investigation was in progress since its reinstatement in April 1997. Plaintiffs filed their original complaint in December 1997. Therefore, there was an ongoing state judicial proceeding, the DACO investigation, when Plaintiffs filed their initial claim. Additionally, P.R. Cement prevailed before the Administrative Law Judge and the matter is now pending on writ of certiorari before the Puerto Rico

Supreme Court.[15] As *Younger* has been held to include appellate proceedings, *Huffman*, 420 U.S. at 609, 95 S.Ct. 1200, we find that this pending appeal constitutes an ongoing state proceeding within the meaning of the first prong for federal abstention under *Younger.*

### b. *Important State Interests*

The state interests at issue in the DACO investigation are enforcement and uniformity of state labeling requirements. While undeniably of important local concern, such interests are not sufficiently significant to eclipse the overriding importance of Plaintiffs' claims of unlawful application of state policies. Additionally, as we previously noted, Plaintiffs' claims challenge Defendants' conduct, not the rules themselves. We know of no exclusive state interest that trumps federal claims of unconstitutional conduct. *See Cullen v. Fliegner*, 18 F.3d 96, 104 (2d Cir. 1994) ("a state cannot have a legitimate interest in discouraging the exercise of constitutional rights ... or, equally, in continuing actions otherwise brought in bad faith, thereby reducing the need for deference to state proceedings"). Accordingly, we find that the second prong of *Younger* has not been met.

### c. *Opportunity to Raise Federal Claims in State Court*

The third prong requires that plaintiffs have a state court forum for the adjudication of their federal claims. To satisfy this requirement, Defendants need to show that Plaintiffs had a fair opportunity to raise their constitutional claims in the state proceedings.

▇▇▇ Plaintiffs correctly contend that it is absurd and in clear contravention of the *Younger* doctrine to presume that a fair proceeding could take place regarding the unconstitutionality and illegal practices of those very persons before whom the claims are presented. However, it seems equally likely that such claims could be successfully presented before an impartial Administrative Law Judge.

In fact, it appears that this is exactly the situation before us. On March 16, 1998, an Administrative Law Judge rescinded the charges against P.R. Cement and sternly chastised both DACO and Secretary Alicea. *Docket Document No. 232.* The Judge castigated Secretary Alicea and DACO for engaging in "abnormal" administrative practices, "arrogat[ing] powers" from other agencies, acting "ultra vires," employing "draconian" tactics and abusing their discretion and powers by displaying "contempt for the clear letter of the law." *Id.* The Puerto Rico Court of Appeals, on June 29, 1998, affirmed the Administrative Law Judge's ruling. This affirmation is pending before the Puerto Rico Supreme Court. Therefore, from the point where the administrative proceeding began, Plaintiffs likely had an opportunity to raise their constitutional claims in state court proceedings.

However, Plaintiffs contend that this forum was inadequate to address the allegations of a far-reaching campaign of retaliation against P.R. Cement and El Día. Thus, Plaintiffs maintain that such a forum did not provide a realistic opportunity for adjudication of their constitutional claims. As Plaintiffs' claim regarding the DACO investigation is merely a piece of the much larger set of allegations of retaliation against P.R. Cement and El Día, we find that the state proceedings failed to offer Plaintiffs an adequate opportunity to fully address their constitutional claims.

In sum, while the first prong of the *Younger* analysis, an ongoing state court proceeding, has been satisfied, we find that this case fails to satisfy either the second prong, important state interests pointing towards abstention, or the third prong, a full and fair opportunity to adjudicate the federal claims. Therefore, we decline to abstain under the doctrine of *Younger v. Harris.*

### V.

### *Conclusion*

We **GRANT** Plaintiffs' motion to amend their complaint pursuant to Fed.R.Civ.P.

---

**15.** The Administrative Law Judge held that DACO's reinstatement of the investigation into possible improper labeling of cement bags was arbitrary and improper and Defendants' have petitioned for a writ of certiorari.

15(a) and (c). We **DENY** Defendants' motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) as to Counts II, DACO Secretary Alicea's October 15, 1997 order, ARPE's revocation of the Guánica permit and the Office of Monopolistic Affairs investigation segments of Counts III and Count IV; **DENY** Plaintiffs' request for reconsideration of Defendants' qualified immunity in Count IV; and **GRANT** Defendants' motion as to the DACO investigation segment of Count III and Count V. We additionally find that abstention is not appropriate in this case.

**IT IS SO ORDERED.**